Filed 5/11/23 Youssef v. County of Los Angeles CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ERENI YOUSSEF,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>COUNTY OF LOS ANGELES,[1]<br><br>        Defendant and Respondent. | B315531<br><br>(Los Angeles County<br>Super. Ct. No. BC701973) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen I. Goorvitch, Judge.  Affirmed.
        Law Offices of Gavril T. Gabriel and Gavril T. Gabriel for Plaintiff and Appellant.
        Hausman & Sosa, Jeffrey M. Hausman and Larry D. Stratton for Defendant and Respondent.

---

        [1] Defendant and Respondent County of Los Angeles was erroneously sued as County of Los Angeles Probation Department.

Plaintiff and appellant Ereni Youssef appeals from a judgment following an order granting summary judgment in favor of defendant and respondent County of Los Angeles (County) in this action for employment discrimination under the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.).[2]  On appeal, Youssef contends triable issues of material fact exist as to whether:  (1) the continuing violation doctrine applied to extend the statute of limitations; (2) she suffered a hostile work environment based on her disability; (3) she was discriminated against based on her disability; (4) she suffered retaliation for complaints that she filed; (5) the County failed to accommodate her disability; and (6) the County failed to engage in the interactive process.  We do not determine whether the continuing violation doctrine applies, because even assuming the doctrine applies, no triable issue of fact has been shown as to any of Youssef's claims, and therefore, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### Work History Prior to Date of Disability

The County hired Youssef in 1989.  She worked in various departments and received several promotions.  In January 2010, she took a position as a management analyst, more commonly referred to as a case manager, in the return-to-work unit of the risk management section of the probation department.  The unit manages workers' compensation claims and compliance activities

---

[2] All further references are to the Government Code unless otherwise specified.

related to disability issues for the probation department, which includes more than 20 area offices, courts, three juvenile halls, and camps that serve the juvenile halls.

A case manager handles a caseload of workers' compensation cases, evaluates work restrictions, engages in the interactive process with employees, and works with employees to allow them to return to work at the earliest point in time. Case managers must have strong verbal and written communication skills. One of essential job functions of a case manager is to conduct interactive process meetings (IPM's) with employees who are disabled or have work restrictions. A second return-to-work employee typically attends the IPM to take notes. Toyea Sims had been working as a case manager in the unit for one or two years when Youssef started her position.

Case managers are supervised by senior departmental personnel technicians, but senior departmental personnel technicians have their own caseloads. Case managers and senior departmental personnel technicians are not assigned to the same cases. They are assigned to locations, so they handle cases based on the location where the injury occurred or the injured employee worked. Some caseloads, such as Youssef's, involved sedentary office work, while others were field positions that were not sedentary.

In November 2011, Cynthia Maluto transferred to the unit to serve as the manager and became Youssef's second-level supervisor. Beginning in early 2012, Maluto asked Sims to act as a senior department personnel technician by supervising Youssef, even though they held the same title.

In 2012, Youssef experienced pain in her knees, shoulders, and neck, which caused her to walk more slowly than most employees.

In August 2012, Youssef and Sims passed an examination required for promotion to the senior departmental personnel technician position.  They were placed in the same eligibility band.

Youssef was assigned the caseload for Central Juvenile Hall.  In September 2012, Maluto required the three case managers assigned to the three juvenile halls to work at the juvenile hall locations.  Youssef had to work at Central Juvenile Hall, several miles from where she worked previously.

When Youssef requested overtime in September 2012, Maluto required her to list the work that she performed during each hour of overtime.  After this incident, Youssef only requested overtime a few times.

In November 2012, on the day before Youssef was scheduled to take a two-week vacation, Maluto gave Youssef a substantial assignment.  Youssef cut her vacation short to complete the project.

**A.  January 2013 Worker-Supervisor Conference**

On January 10, 2013, Maluto, Sims, and Youssef participated in a worker-supervisor conference.  Maluto presented a counseling memorandum to Youssef that described several performance issues, including tasks that were overdue or incomplete.  Maluto required Youssef to draft a summary of certain workers' compensation cases within three weeks, in addition to her regular work.  Maluto also told her to produce

4

documents in a particular font size, which was harder for Youssef to read.

Youssef refused to sign the counseling memorandum. In a written response to Maluto and Sims, Youssef disputed several issues raised during the conference. She noted that the probation department had approximately 650 cases, which were divided among seven employees. Youssef's assignment, Central Juvenile Hall, was the largest location with the most difficult cases. Youssef's caseload of 130 to 150 cases accounted for approximately one-fourth of the overall cases. In July 2012, case managers had also been given time-consuming additional responsibilities because of the staff shortage in the unit. After Maluto began managing the unit, seven employees transferred out and only two staff members had been hired.

### B. January 2013 Incident Report

On January 24, 2013, Maluto issued an incident report that assigned responsibility to Youssef for delayed benefit payments to an employee. In Youssef's view, another employee was responsible for the error that caused the payment delay.

Youssef took the workers' compensation case summary project home, working late without requesting overtime until the project was completed.

**Events After Date of Disability—February 19, 2013, Outside of Limitations Period**

On February 19, 2013, Youssef's orthopedics doctor placed her on medical leave and she began treatment for injuries to her

neck, shoulders, and knees due to repetitive motions. Minimal work was completed on Youssef's cases in her absence. She returned to work on August 14, 2013. She filed a workers' compensation case based on the February 2013 injury, which Maluto and Sims knew about.

## A. 2013 Performance Review

Maluto and Sims met with Youssef to deliver a performance evaluation covering her work from June 2012 to February 2013, prior to her medical leave. The evaluation stated that Youssef had difficulty completing work on time. It summarized the January 2013 worker-supervisor conference. With respect to the quality of her work, the evaluation stated, "Ms. Youssef's work is usually submitted in a neat and legible manner; however written documentation is difficult to comprehend due to grammar and conjugation. Errors impair the meaning and effectiveness of the process. Ms. Youssef has struggled with written and oral expression. Ms. Youssef's inability to communicate well verbally has limited her effectiveness in conducting IPM's, which is an essential function of a Case Manager. This inability has resulted in her supervisor having to conduct the IPM[']s, negating the supervisor's ability to supervise her unit. Ms. Youssef is rated Improvement Needed in this area." The evaluation listed several examples that occurred during the evaluation period. The evaluation described the January 2013 incident that caused an employee's benefits to be delayed, but rated her as competent in the area of work habits.

6

After three months, Youssef was placed on medical leave again in November 2013. She was on medical leave throughout 2014, during which she had knee surgery and gained weight.

On January 7, 2014, while Youssef was on leave, her attorney sent a letter to Maluto requesting revisions to the performance evaluation. The attorney asserted that most of the issues had been rebutted already in Youssef's written response to the January 2013 conference. Youssef admitted making a grammatical error in one letter, but argued that she drafted other letters based on samples provided by Sims. The attorney added, "Finally to the extent that the unit is experiencing problems, such problems are directly attributable to the loss of employees. As a result of the continuous loss of employees, the department has added responsibilities to the remaining employees, including Ms. Youssef. Hence, and as a direct result, the amount of work each employee must perform has increased." The letter did not claim that Youssef had a greater workload than other case managers, did not mention Youssef's disability, and did not make any allegations of discrimination, harassment, or retaliation.

In July 2014, while Youssef was on medical leave, Maluto promoted Sims to a permanent position as senior departmental personnel technician. Youssef believes employee Vicki Hooks was transferred to the unit, assigned the caseload for Central Juvenile Hall, and promoted to senior departmental personnel technician.

## B.  First IPM

Youssef returned to work on May 21, 2015.  On June 9, 2015, Youssef, Sims, and Norma Diaz participated in an IPM for Youssef.  The IPM worksheet listed her temporary work restrictions as follows:  sedentary work only; no overhead use of the injured extremity; no climbing, bending, squatting, or kneeling; lifting limited to five pounds; typing limited to two to three hours per day; and parking close to the entrance.

Youssef was assigned the caseload for Los Padrinos Juvenile Hall, which had 61 cases at that time.  Sims and Diaz said if Youssef could not manage the cases at Los Padrinos Juvenile Hall, Maluto would go with "Plan B."  The IPM worksheet stated that Youssef was not sure whether the caseload would violate her work restrictions, but she was willing to try.  The worksheet also stated that if Youssef could not handle the caseload, Sims would talk to Maluto to discuss other options.

Sims told Youssef to self-administer her work restrictions.  Youssef signed an agreement stating that she would work within her physician's limitations, and if she was given any duties outside her limitations, she agreed to immediately notify her supervisor and the return-to-work coordinator in writing.  Sims signed the agreement on behalf of the probation department.

## C.  Incidents After First IPM

No one had worked on the cases for Los Padrinos Juvenile Hall in months, so the cases required extra work to get on track.  Youssef was also assigned the caseload for Barry J. Nidorf Juvenile Hall when the case manager for that location was

absent. Due to the workload, Youssef felt she would be disciplined if she followed her doctor's work restrictions.

In June 2015, Maluto scheduled a unit meeting and explained how to perform a particular project. Youssef was unable to attend, because she was at a class that Maluto assigned. She received a project that required the training covered in the unit meeting. Sims agreed to provide the instructions to Youssef, but did not. Youssef asked coworker Lena Virgil for help. Youssef believed Sims was surprised when Youssef gave her the completed assignment.

In August 2015, Youssef attended a unit meeting that provided training for a certain type of investigation. Youssef felt humiliated and harassed when she was asked to leave the room because no cases were going to be reviewed for Los Padrinos Juvenile Hall. She did not receive the training that the meeting participants received.

Maluto set a unit meeting for Friday, December 11, 2015, which was not a day that Youssef was scheduled to be in the office. Youssef sent an email to Maluto explaining that she had declined the meeting because she was not scheduled to work that day, but asked if Maluto wanted her to attend. Maluto responded, "[Y]ou don't have to come in, it's not mandatory. Toyea can update you on what we discuss. [¶] That was the only day that I could schedule the meeting because I am off all next week and then it's the holiday weeks and a lot of staff will be off." Youssef heard later that people exchanged holiday gifts at the meeting.

Case managers held monthly claim review meetings with the third-party administrator. The meetings were generally attended by a county monitor, return-to-work representatives,

9

county counsel, and a representative from human resources. An adjustor from the third-party administrator would state the claimant's age, weight, and height, which was necessary information for the review. During a meeting on January 13, 2016, Maluto sat next to Youssef and said in her direction, "Oh my god. This person is the same height as me, weighing 238 pounds. That is so obese. Oh my god, I cannot believe that." She asked, "Is he even able to walk with this much weight?" and "what is his life expectancy?" The injured worker's weight was less than Youssef's weight at the time.

Maluto was promoted to manage the entire risk management section. Rachel Lara became the manager of the return-to-work unit in February 2016. Sims reported to Lara, and Youssef continued to report to Sims.

In March 2016, Lara scheduled a staff meeting on the second floor. Most employees took the stairs to reach the meeting room, but Youssef had to take the elevator due to her injured knees. Youssef arrived a few minutes late. Lara said, "You made it!" Youssef perceived Lara's comment to be sarcastic, because Lara had seen Youssef in the office earlier and it was not a surprise that Youssef attended the meeting.

In April 2016, at a meeting at Los Padrinos Juvenile Hall, the superintendent for the hall commented that when people got hurt in the old days, they got up and went on with their day as if nothing happened, but now, employees did not want to work with even a minor injury. Lara responded, "Why are we talking about other employees, when we have one right here." Youssef was the only employee with disabilities present who had taken extended medical leave, so she believed the comment was about her.

### D. 2016 Performance Review and Improvement Plan

In August 2016, Sims presented Youssef with a performance evaluation for the period July 2015 to June 2016. The evaluation stated Youssef was assigned the caseload for Los Padrinos Juvenile Hall, which increased from 61 cases at the time of the assignment to 68 cases at the time of the evaluation.

The evaluation rated Youssef as needing improvement in the area of work quality and as competent in all other areas. With respect to work quality, the evaluation stated, "Ms. Youssef's work is usually submitted in a neat and legible manner; however, her work falls below Department standards due to deficiencies in her writing skills that impair or negate the effectiveness of her work. Ms. Youssef struggled with written and oral expression. Ms. Youssef's inability to communicate verbally has impacted her ability to conduct IPM[']s, which is an essential job function of a Case Manager. This inability has resulted in Ms. Youssef's supervisor having to conduct her IPM[']s. In this area, Ms. Youssef is being rated improvement needed." The evaluation listed specific documents Youssef drafted that had grammatical errors.

The evaluation noted that Youssef had been given a workload of 68 cases to allow her to adjust to the systems and processes for managing cases in the unit. It concluded, "During this time, Ms. Youssef's supervisor had to attend several IPM[']s with her. It has been observed that she has a very difficult time communicating with employees. Also, Ms. Youssef has drafted several letters, all of which contain several grammatical errors and lack proper structure. Her performance has fallen below the

11

minimum standards of her position. Ms. Youssef is being rated overall Improvement Needed."

The evaluation was signed by Sims, Lara, and department head Deanna Carlisle. Youssef refused to sign the evaluation.

Youssef was placed on a six-month plan for individual improvement. The plan required Youssef to increase the quantity of work that she completed by meeting certain goals. She would improve the quality of her work by taking certain steps, including thoroughly reviewing letters prior to submitting them for signature. She would improve the manner in which she conducted IPM's by observing IPM's conducted by other case managers, for which Youssef would take notes. She was to meet with her supervisor every other week to have her work reviewed for content, accuracy, and timely completion. If she failed to demonstrate continuous progress toward the goals of the plan, the plan would be terminated and she would be rated "unsatisfactory."

As a result of the performance evaluation, Youssef began having nightmares, severe anxiety, difficulty breathing, and fears for her well-being and job security. In August 2016, her psychiatrist prescribed medication and therapy, and placed her on medical leave. The period of the improvement plan was extended as a result of Youssef's medical leave.

**Incidents Within the Limitations Period for FEHA Claims—December 18, 2016, to December 18, 2017**

On January 5, 2017, Youssef sent a letter to Sims alleging legal violations, violations of internal policies, and discrimination under Maluto's supervision. Specifically, she alleged the

following misuse of County resources by her coworkers: completing their children's school projects during work hours; planning graduation parties for their children using County resources such as copier, ink, and paper; using work time to make personal telephone calls and using the internet for personal reasons; using lunch time to pick up food that they ate during work time; shopping and transporting children during overtime hours; paying overtime to staff who were not in the office or conducting office business; and approving overtime pay to compensate for extra responsibilities. In addition, Youssef stated she was required to comply with a process for authorizing overtime that other employees were not.

Youssef complained that the managers built relationships with certain staff based on favors, while discriminating against others. Although Sims and Youssef took the same promotion examination and were placed in the same eligibility band, as a result of favoritism, Sims was placed as Youssef's immediate supervisor and promised a promotion, while Youssef was harassed, so that she would be written up and unpromotable.

She described the comments that Maluto made about an obese claimant, which Youssef found offensive. She stated that in the meeting, a coworker asked Maluto to stop mocking injured workers, but Maluto continued until another staff member ordered her to stop. Youssef also described the meeting where she had no cases for review and was asked to leave.

She complained that Maluto scheduled unit meetings on days when some staff were not present and excluded Youssef from emails intended for the unit staff. Youssef considered the August 2016 performance evaluation to be harassment as a

13

result of her workers' compensation claim and her physical disability.

Youssef requested a transfer to another unit for relief from the emotional distress caused by the management of the return-to-work unit. The County instituted an internal investigation based on Youssef's complaint.

At the end of the month, Youssef provided documentation from her psychiatrist stating that Youssef would be able to return to work on February 16, 2017, in a different unit with a less stressful environment.

Youssef returned to work on February 16, 2017. In interrogatory responses, Youssef stated that she was given a new set of cases from area offices, which had additional processes. However, in her declaration, she stated that she was assigned again to Los Padrinos Juvenile Hall. She was no longer assigned the caseload for the Barry J. Nidorf Juvenile Hall when the case manager for that hall was absent.

## A. Second IPM for Psychiatrist's Note

In February 2017, the day after she returned to work, Youssef, her counsel, Lara, and a representative from the county counsel's office attended an IPM for Youssef to address her psychiatrist's note. Lara's meeting notes stated that Youssef was willing to work, but not under the same supervision and unit. Youssef particularly objected to Maluto's authority over the unit, as well as the friendship among Maluto, Lara, and Sims, although she stated that she did not have as much of an issue with Sims.

Lara sent a letter to Youssef confirming the substance of the meeting. Lara had offered for Youssef to report directly to her, rather than to Sims, but Youssef said she did not have a problem reporting to Sims. Youssef also said she felt harassed and discriminated against, and could no longer endure this kind of treatment.

In April 2017, Maluto was reassigned and no longer Youssef's supervisor at any level.

## B. Additional IPM's for Work Restrictions

On April 6, 2017, Youssef, Sims, and return-to-work case manager Kim Pickett participated in an IPM to address permanent work restrictions imposed by the agreed medical examiner (AME) in Youssef's workers' compensation proceeding. The AME recommended "[n]o prolonged weight bearing." Youssef disagreed with this recommendation, because it did not address all of her injuries.

A few weeks later, Youssef provided Lara with a note from Dr. Phillip Kwong listing several additional work restrictions. Youssef and Lara attended an IPM on May 1, 2017, to address temporary work restrictions imposed by Kwong. The IPM worksheet listed the following restrictions: no driving more than 10 miles; parking close to the office entrance; standing or walking for 20 minutes of every hour; typing a maximum of two to three hours per day; and no climbing, bending, squatting, or kneeling.

Notes from the meeting stated that the temporary work restrictions did not interfere with Youssef's essential job duties. Her position was not field based. On occasion, she might have to drive to meetings, but could carpool or seek alternate

transportation.  Youssef would self-monitor her standing, walking, and typing restrictions to prevent exacerbating her injuries.  She had already been provided a reserved parking space in front of the building.

Youssef signed the May 1, 2017 IPM worksheet agreeing with the work restrictions, that she could perform the usual and customary duties of her position, and that no accommodations were needed.  Youssef believed her workload would comply with the restrictions listed in the document.

Youssef provided the County with an additional letter from her psychiatrist and requested a transfer from the return-to-work unit.  On May 9, 2017, Youssef, her counsel, Lara, and a representative from the county counsel's office attended another IPM for Youssef.  In a summary of the meeting, Lara reported that the psychiatrist said Youssef could perform all of the essential job functions listed for a management analyst in the return-to-work unit without accommodation.  The psychiatrist stated that Youssef's restriction referred to "the environment of discrimination in the office with constant questioning of her work, scrutiny and belittling of her work.  Namely by her supervisors and managers."  Lara had informed Youssef at the meeting that she would not be transferred, "because inability to work with a particular supervisor or manager is not a disability requiring an accommodation" under the law.  Although the doctor's note referred to discrimination, nothing presented at the meeting had shown Youssef was subjected to discrimination.  Lara said to inform her if Youssef experienced any conduct in the workplace that Youssef believed was discriminatory, and Lara would address it.  Lastly, Lara said if Youssef had medical

16

documentation different from that already discussed, to submit it to her so that Lara could schedule another IPM.

The following day, Youssef received three assignments that she believed should have been completed by the risk management safety inspector and required driving to an employee's work site.

On June 2, 2017, Youssef met with Sims about the improvement plan. Sims praised Youssef's work, and Youssef was not asked to attend any further meetings under the plan.

On June 28, 2017, Youssef sent an email to Lara with a medical note attached. Lara responded that she would check her schedule about meeting with Youssef to review and discuss the note. Youssef later declared that Lara did not follow up.

Shortly afterward, Youssef was assigned the caseload for Central Juvenile Hall. The former case manager for Central Juvenile Hall had not worked on the cases in months and left the unit. The cases were in disarray and required a lot of work. The additional assignment brought Youssef's caseload to 140 cases.

On August 9, 2017, Youssef went out on medical leave. On December 18, 2017, Youssef filed a claim with the Department of Fair Employment and Housing (DFEH) and received a right-to-sue letter.

Youssef returned to work a few days later. On December 26, 2017, Youssef, Sims, and Pickett attended an IPM to address the following temporary work restrictions imposed by Youssef's doctor: limited weight bearing; typing no more than 60 minutes without a 10 minute break; no repetitive lifting, pushing, pulling, or carrying; no prolonged overhead work or extension of the neck; and maximum lifting of five pounds. Youssef agreed with the restrictions. Accommodations were offered that if a file weighed more than five pounds, Youssef would ask for assistance,

17

which Youssef accepted. The notes taken at the IPM stated that Youssef agreed she can perform her usual and customary duties with the accommodation of assistance lifting files greater than five pounds.

Youssef, Pickett, and another return-to-work case manager attended an IPM for Youssef on December 28, 2017, to address a permanent work restriction imposed by an AME in Youssef's workers' compensation proceeding. Youssef disagreed with the restriction that she should remain working sedentary duties, but agreed that she could perform the usual and customary duties of her position and no accommodation was necessary.

In December 2017, Youssef was assigned to the area offices, but also assigned to a juvenile hall when the case manager for that hall left.

**Complaint and Subsequent Events**

On April 16, 2018, Youssef filed a complaint against the County alleging discrimination, harassment, and retaliation, among other causes of action.

In June 2018, Lara transferred to another entity. Sims became the acting manager of the return-to-work unit for the probation department.

Youssef took two weeks of medical leave in June 2018. When she returned, Youssef was assigned to the first 90 days of all workers' compensation cases for all of the area offices. She was also assigned to the first 90 days of the cases at the Barry J. Nidorf Juvenile Hall when the case manager for that hall went on leave, and she was assigned to the camps. A case manager

18

was hired for the camps, but Sims did not transfer the camp cases to the new case manager for several months.

On April 26, 2019, Youssef filed the operative third amended complaint against the County alleging causes of action that included discrimination, harassment, retaliation, failure to provide reasonable accommodation, and failure to engage in the interactive process. She alleged that she was a 56-year-old woman whose disabilities were severe pain in her shoulder, neck, and knee, obesity, recovery from knee surgery, anxiety, and depression.

## Motion for Summary Judgment and Supporting Evidence

On November 14, 2019, the County filed a motion for summary judgment on several grounds, including that there was no basis to find a continuing violation, no adverse employment action had been taken against Youssef, the alleged harassing conduct consisted of common managerial decisions, being overworked was not a FEHA violation, no relationship had been shown between any employment action and Youssef's disability, the County interacted and accommodated Youssef, and there was no retaliation.

### A. Maluto's Declaration

In support of the motion for summary judgment, the County submitted Maluto's declaration as to the following evidence in addition to facts above. It was necessary in the return-to-work unit to discuss the physical attributes and limitations of other employees. If Youssef heard comments about

19

the physical condition of other employees, the statements would have been job related. Maluto does not know of any time when comments were directed toward Youssef about her own physical characteristics.

Maluto made no decisions regarding Youssef, including work assignments, based on improper grounds, and she never discriminated, harassed, or retaliated against Youssef based on her disability status. Maluto managed all employees in the return-to-work unit by the same performance-based criteria.

Maluto promoted Sims to a permanent position as senior departmental personnel technician in July 2014, after Sims had been performing the job in an acting role. Although Youssef and Sims were both on the eligibility list for the position, Sims was performing the duties of the position in a superior manner and was the strongest candidate. Maluto believed Sims had a greater understanding of new procedures being implemented in the return-to-work unit, which she had learned and adopted quickly.

In comparison, Maluto perceived Youssef to have performance problems which made her a less qualified candidate than Sims. The relative performance of the two employees was the only factor Maluto considered in selecting Sims over Youssef for the position. She did not consider Youssef's disability status.

During the time that Maluto was in the probation department, all employees had substantial caseloads, including Youssef. Caseloads were highly variable, and the number of cases assigned was not necessarily a meaningful measure of the work load. If a management analyst took leave, other staff members were required to pick up the extra work. Not all of the assigned cases were equally active. Staff were assigned to geographical areas, such as a particular facility, so the number

20

and activity of the cases depended on the facility involved. To the extent Youssef complained of having 100 cases, Maluto had approximately 400 cases when she worked for the return-to-work unit of the Los Angeles County Sheriff's Department. There was no discrimination, harassment, or retaliation in the manner that cases were assigned to Youssef in the return-to-work unit or in the number of cases that she received. Youssef was not treated differently from other management analysts in regard to workload. Maluto is not aware of any time when Youssef was provided assignments which violated her workers' compensation work restrictions.

Maluto never intentionally gave Youssef an assignment that shortened her vacation. If Youssef had raised the vacation, Maluto would have made other arrangements by assigning work differently.

Staff parties, including holiday parties, were not combined with meetings in the return-to-work unit. All return-to-work staff were invited to all holiday parties and unit celebrations. Maluto was not aware of any instance where Youssef was not invited to a party.

Maluto may have said it was better for employees to return to work and be placed on light duty, rather than to stay at home, because employees are known to heal more quickly when they return to work. Maluto had no involvement with tax reporting issues by the County concerning County employees. She had no involvement with Youssef's W-2 forms or any wage and tax statement issued by the County to her. Tax reporting issues were outside her job functions.

21

## B. Lara's Declaration

The County also submitted Lara's declaration as to the following evidence. Sims prepared the August 2016 performance evaluation that rated Youssef's performance as "Improvement Needed." Lara reviewed and approved the evaluation based on her own observations, as well as reports from Sims. Youssef fell below performance standards in the area of quality. Youssef's work included persistent grammatical errors during the rating period.

Lara was not aware of Youssef's employment complaints until January 2017, when Sims received Youssef's letter. In claim review meetings, frank discussions had to be held about the claimant's overall health, fitness, and physical condition. Lara never witnessed any staff member make inappropriate statements or insinuations to Youssef about her weight or disability.

When Lara managed the return-to-work unit, it was not unusual to limit attendance at meetings to relevant staff in order not to waste employees' time with unnecessary meetings. During the time that Lara managed the return-to-work unit, the unit was short staffed. All case managers, including Youssef, had a large caseload, and when a staff member took leave, the caseload became greater for the remaining staff members. Lara attempted to place caseloads in rough parity between various staff members, but precise equality was impossible. Assignments were made based on geography and facilities, so the number of claims were never equal. In addition, some cases were more active than others. The number of claims at a given facility changed as well. Because of these factors, the number of case assignments was not

necessarily an accurate reflection of a case manager's workload. Youssef's disability status was never a factor in the nature or quantity of assignments given to her.

Lara had no recollection of exclaiming, "You made it!" after Youssef arrived at a meeting. If she made such a statement, it was not a commentary upon Youssef's weight or disability status. Lara preferred to take the elevator, so would not have commented on Youssef's use of the elevator due to her weight.

Lara recalled discussing Youssef's driving restriction at the May 9, 2017 IPM. Youssef's position was a desk position, not field work, and when it was necessary for Youssef to travel to meetings, including claim review meetings at the third-party administrator's office, Youssef could carpool with other staff members. Youssef had a keyboarding restriction, but typing on a keyboard was a minor aspect of her duties as a case manager. Youssef could self-monitor her keyboarding to ensure that she was working within her workers' compensation restrictions.

One of Youssef's doctor's notes provided a work restriction that referred to an environment of discrimination subjecting Youssef to constant scrutiny, for which Youssef sought reassignment out of the return-to-work unit. Lara was not made aware of any factual basis or evidence supporting a discrimination claim. Lara and the county counsel representative told Youssef and her attorney that an inability to work with a particular supervisor was not a disability requiring accommodation. There were significant business reasons to deny reassignment without good cause while a plan for improvement was in place. Reassigning the employee to a different supervisor or unit would defeat the purpose of the plan designed to remedy performance and allow the employee to avoid reassessment. Lara

believed Youssef's work restrictions did not conflict with her usual and customary duties, because her work as a case manager was sedentary, and she could self-monitor her activities to stay within the guidelines of her restrictions.

Lara made every effort to be responsive to Youssef's request for interaction. She did not recall the June 2017 email from Youssef referring to her work restrictions, but Lara would not have intentionally failed to respond or follow up. Youssef never said that her duties required her to violate her work restrictions. Lara met with Youssef in formal and informal settings, and repeatedly said to tell her if anything interfered with her work restrictions. To Lara's knowledge, all of Youssef's medical restrictions were fully accommodated during the time that Lara managed the return-to-work unit.

Whenever case managers worked overtime, they were required to list the work that was completed. Lara never made any decision related to Youssef motivated by discrimination, retaliation, or harassment.

Lara was reassigned before Youssef's plan for individual improvement was completed.

### C. Sims's Declaration

The County submitted Sims's declaration as to the following information. Case managers must discuss whether certain illnesses, conditions, or disabilities affect an employee's ability to return to work, including whether the employee should be placed on light duty. Obesity is a comorbidity with other conditions, such as diabetes, joint conditions, and cardiovascular issues. An employee's obesity might be raised during the claim

24

review for the employee's workers' compensation case. The work of the unit would be severely hampered if these discussions could not occur. It would be unreasonable for a case manager in the unit to personalize the discussions. Sims was not aware of any instance when comments were directed toward Youssef concerning her own physical characteristics or disability status.

Sims managed all employees in the unit by the same performance-based criteria; she never took any action against Youssef based on her disability status.

At the June 9, 2015 IPM, all of the accommodations that Youssef required were provided. Youssef's position required some limited typing, but not constant typing. Youssef was in the best position to monitor her own activities on the job in order to meet her restrictions. Youssef's job duties did not change after her return to work, and Youssef was able to perform the essential functions of her position throughout the time periods at issue.

Sims prepared Youssef's 2015-2016 performance evaluation. Sims attended some IPM's for which Youssef was the case manager. In Sims's observation, Youssef often appeared unprepared, and often failed to communicate in a clear manner with the employee. On some occasions, Sims was compelled to intervene and take over Youssef's IPM's. In addition, Youssef's written work contained persistent drafting and grammatical errors during the rating period.

Youssef was placed on a performance improvement plan to improve the quality of her work and increase the quantity of her work. The purpose of the plan was remedial, not disciplinary. When Youssef returned to work following her medical leave, she did not complete the improvement plan. After that time, in light of her extended medical leave, management decided to continue

observing her progress through the next rating period. No employment action was taken as a result of her placement on the improvement plan or her evaluation as needing improvement.

Sims declared that caseloads were variable, and the number of cases assigned was not necessarily a meaningful reflection of an employee's workload. There was no discrimination, harassment, or retaliation in the manner cases were assigned to Youssef or in the number of cases that she received. Youssef was not treated differently from other case workers in regard to the caseload assigned.

Youssef's caseload was also consistent with her work restrictions. Her position was not a field position. It involved office work, which was sedentary. Her work restrictions were generally enforced through her own self-monitoring. Sims told Youssef to notify the return-to-work unit if she believed a task violated her work restrictions. Had Youssef advised the unit that her activities violated her work restrictions, Sims and the unit would have responded by interacting and seeking to accommodate her.

Staff parties were not combined with meetings. Sims was not aware of any instance where Youssef was not invited to a party, and no party would have been purposefully scheduled during a time that Youssef was on leave.

Sims was not involved with tax reporting issues or Youssef's W-2 forms. Tax reporting issues were outside Sims's job functions. Sims was not aware of any instance when Youssef was denied overtime opportunities. Even if she did not receive desired overtime, no decision relating to overtime was based on any unlawful factor, such as her disability status.

26

### D. Additional Evidence

The County submitted Youssef's interrogatory responses as well. Asked to name and describe each disability alleged in the pleadings, Youssef stated that she suffered injuries to the neck, shoulders, and knees due to repetitive motions, which occurred approximately on or about February 19, 2013. Maluto had given Youssef a short deadline to complete a long project, which precipitated Youssef's medical leave in February 2013. She took work home to comply with Maluto's unrealistic expectations. Aside from physical injuries, she suffered severe emotional distress and continuous stress from a hostile and overworked environment.

In addition, the County submitted IPM documentation, Youssef's January 2017 letter to Sims, her performance improvement plan, and discovery responses.

## Opposition to Summary Judgment and Supporting Evidence

Youssef opposed the motion for summary judgment by arguing there were triable issues of fact as to whether: the continuing violation doctrine applied to extend the statute of limitations; employees belittled Youssef about her weight and disability; she suffered an adverse employment action because her caseload was substantially higher than her peers and her negative performance evaluation made her unpromotable; Maluto and Sims acted with a discriminatory motive; Youssef suffered retaliatory adverse employment actions; the County failed to engage in a good faith interactive process by not meeting until

27

June 9, 2015, not scheduling an IPM after Youssef sent a medical note in June 2017, and denying her transfer request; and the County failed to accommodate Youssef because they knew self-monitoring was inadequate due to her increasing workload but never offered modified work, transfer to a different unit, or transfer to a different supervisor.

## A. Youssef's Declaration

Youssef submitted her own declaration as to the following information in addition to the facts stated above. Youssef requested overtime only a few times after the incident in September 2012 for fear of retaliation. Maluto had fired several people and Youssef was afraid to be fired. Her coworkers were not asked to track their overtime hours.

After Youssef returned to work in August 2013, her heath continued to decline as a result of the comments made by Maluto and Sims. During unit meetings, Maluto spoke negatively about workers' compensation cases that were very similar to Youssef's experience, insinuating that Youssef's medical concerns were not genuine. Maluto often suggested workers' compensation cases were fraudulent. If a disability was not obvious, Maluto seemed to believe the disability did not exist or was faked by the claimant.

Youssef agreed that discussion of the conditions of injured workers at claim review meetings with the adjusters was an essential job duty. It was not the case manager's job, however, to evaluate or question a claimant's medical conditions or physical limitations. The case manager only needed to know the restrictions to accommodate the injured worker properly. Case

managers were not required to discuss a claimant's medical conditions, life expectancy, or appearance, and Youssef considered it unprofessional to discuss a claimant's weight.

By early 2016, Youssef notified her supervisors that her taxable income had been miscalculated. Maluto and Sims were responsible for contacting the third-party benefits administrator and requesting a corrected notice. Instead, they forwarded Youssef's benefits notice to the third party without correction. When Youssef asked about her incorrect W-2 notice, Sims referred Youssef to a person in the payroll unit. Had Sims or Maluto contacted the third-party administrator and requested a correction, Youssef would have been paid timely and correctly. Instead, Youssef paid much more in taxes than she was required to pay. The error also affected her family's ability to qualify for financial aid for her daughter, because the W-2 showed more income than Youssef earned. Youssef requested the correction from payroll again the following year, in February 2017, when she returned to work.

Youssef disputed the August 2016 performance evaluation regarding her oral and written communication skills. Youssef has a slight accent due to her Egyptian background, but people did not have trouble understanding her speech. Maluto had never attended any of Youssef's IPM's. Lara attended a couple of Youssef's IPM's and praised how Youssef conducted them. She noted that case managers gave drafts of documents to supervisors for review before mailing, and Lara had a reputation for extensive editing, but no other case manager had been placed on a plan for individual improvement because of the grammar in drafts. Before being supervised by Maluto and Sims, Youssef had

never received a complaint or a negative evaluation based on her verbal or written communication skills.

After Youssef returned to work in February 2017, her supervisors did not hold the meetings specified under her improvement plan and Youssef did not receive any notice about the recalculated dates for the plan. Youssef was assigned to Los Padrinos Juvenile Hall without any help, while managers assigned to other juvenile halls had assistance.

After the May 1, 2017 IPM, at which Youssef agreed she could perform her duties without accommodation, she found it impossible to self-monitor, because working on a large number of cases required significantly more than two to three hours of typing per day. She informed her supervisors that the initial accommodations were inadequate, but no supervisor offered even part-time help. Youssef believed this was intended to overwhelm her with cases so that she would fail.

At the May 9, 2017 IPM, she complained of harassment, discrimination, and retaliation by Maluto, Sims, and Lara. She also complained about errors in her 2014 and 2015 W-2 forms, and overtime abuses that she had observed. She never stated her disability was an inability to "get along" with a supervisor.

Youssef declared that her caseload of 140 cases between June 28 and August 9, 2017, was well above the normal caseload for other case managers. The additional work worsened her physical disabilities, stress, and anxiety.

## B. Deposition Excerpts and Other Evidence

Youssef also submitted excerpts from her own deposition. When Youssef returned to work after her first medical leave, she

30

believed she was given the work of a senior departmental technician without the title.

Youssef complained about overtime abuses in January 2017, because she thought Maluto, Sims, and another employee were conducting personal business during work time, although she had not seen their timecards. She believed that her supervisors would not approve her to work overtime to prevent her from witnessing their overtime abuses.

Youssef believed Maluto must have provided incorrect information to payroll, or failed to review a notice with incorrect information that the third-party administrator sent to payroll, in order to cause a problem for Youssef with her tax reporting because of Youssef's disability. She assumed her payroll issues resulted from Maluto's action or inaction.

After the December 11, 2015 unit meeting, people told Youssef that the meeting was a Christmas party where people exchanged gifts.

Youssef submitted excerpts from other depositions as well. Maluto stated in deposition that a case manager who did not finish an assignment would be counseled, and depending on the reason, the employee might receive an extension. Case managers could be assigned 100 cases or more, because the unit was under a lot of pressure, and if a case manager went on leave or transferred, that person's caseload had to be managed. Whenever a case manager left the unit, Maluto reassigned the cases by reviewing how many cases the remaining employees had.

At the time of Sims's deposition in October 2019, there were four management analysts and four senior departmental personnel technicians in the unit handling approximately 400 to

480 total cases. The number of cases handled by a particular employee was not a factor in assigning cases. There was an employee assigned to camps for the juvenile halls, an employee assigned to each juvenile hall, and the rest of the offices were divided among the remaining employees. At the time of Sims's deposition, Youssef was handling the first 90 days of cases for the area offices, or until the claim was accepted or denied, at which time it was transferred to the next case manager. In the first 90 days, there is typically not a lot of work to be done with the file. The case usually does not require scheduling IPM's or addressing work restrictions during that time.

Pickett, in her deposition, stated that during the time she was a management analyst in the return-to-work unit, the most cases that she had at one time was approximately 70 cases. Her caseload was unique, however, because she managed field cases.

In Lara's deposition, she stated that Youssef's performance improvement plan was the only one that Lara issued while she worked in the probation department.

Youssef submitted excerpts from the deposition of Virgil, who was a former coworker. Virgil heard Sims and Maluto say that they did not like the way Youssef walked, she walked too slowly, and she would not do her work. Sims and Maluto intimidated everyone, including Youssef. Virgil considered the performance evaluation that Youssef received to be intimidating or bullying. They wrote up three other employees in the same manner until the employees left the department. Virgil considered it a form of harassment to make it unbearable to work by picking on an employee's performance or giving assignments without explanation. Virgil believed Youssef was treated differently from other employees that Sims and Maluto

32

supervised.  Virgil heard Sims refer to Youssef's pace from the parking lot by saying, "I can go home by the time she get in here. I would went home and came back how slow she was walking." (*Sic.*)

Youssef also filed objections to the evidence that the County submitted.

## Reply and Trial Court Ruling

The County filed a reply to the opposition and responded to Youssef's evidentiary objections.  The County also filed excerpts from Virgil's deposition that qualified many of her statements.

A hearing was held on the motion for summary judgment on August 2, 2021.  No reporter's transcript has been incorporated in the record on appeal.  The trial court issued a detailed minute order granting the motion.  The court found the County met its burden on summary judgment to show the alleged adverse employment actions were based on legitimate factors, rather than Youssef's disability status.  The burden shifted to Youssef, who failed to show a triable issue of fact that the alleged adverse employment actions were motivated by her disability. Youssef did not show a triable issue of fact that any negative comments were related to her disability or that the comments were sufficiently severe or pervasive to create an abusive working environment.  There was insufficient evidence of retaliation based on Youssef's disability and insufficient evidence that the County failed to engage in the interactive process or failed to provide reasonable accommodation.  The trial court also sustained three of Youssef's evidentiary objections and overruled the remainder.  The trial court entered judgment in favor of the

33

County on August 10, 2021.  Youssef filed a timely notice of appeal.

## DISCUSSION

### Standard of Review

" 'We review the grant of summary judgment de novo. [Citation.]  We make "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." [Citation.]  A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action.  (Code Civ. Proc., § 437c, subd. (p)(2).)  Once the defendant has made such a showing, the burden shifts back to the plaintiff to show that a triable issue of one or more material facts exists as to that cause of action or as to a defense to the cause of action.' " (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1113.)

" 'In performing our de novo review, we view the evidence in the light most favorable to plaintiffs as the losing parties. [Citation.]  In this case, we liberally construe plaintiffs' evidentiary submissions and strictly scrutinize defendants' own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiffs' favor.' " (*Howard Entertainment, Inc. v. Kudrow*, *supra*, 208 Cal.App.4th at pp. 1113–1114.)  The

"opposition to summary judgment will be deemed insufficient when it is essentially conclusionary, argumentative or based on conjecture and speculation." (*Buehler v. Alpha Beta Co.* (1990) 224 Cal.App.3d 729, 733.)

## Statutory Scheme

Under the FEHA, it is an unlawful employment practice to discriminate against an employee in the terms, conditions, or privileges of employment because of a physical or mental disability or medical condition. (§ 12940, subd. (a).) The FEHA, however, "does not prohibit an employer from . . . discharging an employee with a physical or mental disability, . . . if the employee, because of a physical or mental disability, is unable to perform the employee's essential duties even with reasonable accommodations." (§ 12940, subd. (a)(1).)

The "FEHA proscribes two types of disability discrimination: (1) discrimination arising from an employer's intentionally discriminatory act against an employee because of his or her disability (disparate treatment discrimination), and (2) discrimination resulting from an employer's facially neutral practice or policy that has a disproportionate effect on employees suffering from a disability (disparate impact discrimination)." (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 232.)

"The FEHA requires employers to make reasonable accommodations for employees with disabilities. It provides that '[i]t is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States

or the State of California:  [¶] . . .  [¶] . . . For an employer or other entity covered by [FEHA] to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee.'  (§ 12940, subd. (m)(1).)  An employer, however, is not required to make an accommodation 'that is demonstrated by the employer or other covered entity to produce undue hardship . . . to its operation.' "  (*Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 30 (*Zamora*).)

"In addition to the obligation to make reasonable accommodation for a known physical or mental disability, the FEHA makes it unlawful for an employer 'to fail to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability or known medical condition.'  (§ 12940, subd. (n).)  Section 12940 'imposes separate, independent duties on an employer to engage in the " 'interactive process' " and to make " 'reasonable accommodations.' " ' "  (*Zamora, supra,* 71 Cal.App.5th at p. 30.)

With respect to retaliation, it is unlawful under the FEHA for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."  (§ 12940, subd. (h).)

**Statute of Limitations**

Youssef filed her DFEH complaint on December 18, 2017, but contends that she may recover for acts prior to the one-year

36

statute of limitations under the continuing violation doctrine. "A plaintiff suing for violations of FEHA ordinarily cannot recover for acts occurring more than one year before the filing of the DFEH complaint." (*Jumaane v. City of Los Angeles* (2015) 241 Cal.App.4th 1390, 1400.) The plaintiff bears the burden to demonstrate that claims are founded on a pattern or practice of employer conduct that continued into the limitations period. (*Id.* at p. 1402.) We need not address whether the continuing violations doctrine applies in this case, however, because even if the doctrine applied, no triable issue of fact has been shown as to any claim.

## Harassment

Youssef contends triable issues of material fact exist as to whether she was subject to a hostile work environment. We disagree.

Under FEHA, it is unlawful "[f]or an employer . . . or any other person, because of . . . physical disability, mental disability, [or] medical condition . . . to harass an employee." (§ 12940, subd. (j)(1).) To establish a prima facie case of a hostile work environment, Youssef must show that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected status; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) defendants are liable for the harassment. (*Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 876.)

" ' "[H]arassment consists of conduct outside the scope of necessary job performance, conduct presumably engaged in for

37

personal gratification, because of meanness or bigotry, or for other personal motives. . . . [¶] . . . [¶] . . . [C]ommonly necessary personnel management actions . . . do not come within the meaning of harassment. . . . These actions may retrospectively be found discriminatory if based on improper motives, but in that event the remedies provided by the FEHA are those for discrimination, not harassment. . . . This significant distinction underlies the differential treatment of harassment and discrimination in the FEHA." ' " (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 707.)

" '[A]n employee claiming harassment based upon a hostile work environment must demonstrate that the conduct complained of was severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their [protected status].' (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462.) '[H]arassment creates a hostile, offensive, oppressive, or intimidating work environment and deprives victims of their statutory right to work in a place free of discrimination when the harassing conduct sufficiently offends, humiliates, distresses, or intrudes upon its victim, so as to disrupt the victim's emotional tranquility in the workplace, affect the victim's ability to perform the job as usual, or otherwise interfere with and undermine the victim's personal sense of well-being.' (§ 12923, subd. (a); see also *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 26 (conc. opn. of Ginsburg, J.).) 'A single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile,

38

or offensive working environment.' (§ 12923, subd. (b).) 'The existence of a hostile work environment depends upon the totality of the circumstances and a discriminatory remark, even if not made directly in the context of an employment decision or uttered by a nondecisionmaker, may be relevant, circumstantial evidence of discrimination.' (§ 12923, subd. (c).)" (*Ortiz v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 568, 582–583 (*Ortiz*).)

" 'The harassment must satisfy an objective and a subjective standard. " '[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." . . .' " (*Miller v. Department of Corrections, supra*, 36 Cal.4th at p. 462.) And, subjectively, an employee must perceive the work environment to be hostile. [Citation.] Put another way, "[t]he plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee and that [she] was actually offended." ' " (*Ortiz, supra*, 37 Cal.App.5th at p. 583.)

Youssef identified four incidents when a supervisor made comments that she contends support her claim for harassment. Employees were required to discuss the comorbidities of injured workers during claim review meetings. Maluto discussed the weight of an injured male employee during a claim review meeting about that employee in January 2016. Youssef believed Maluto's comments were directed toward her and she was offended by the remarks. Other employees present at the meeting told Maluto to stop making comments about the employee's weight. Maluto's comments did not refer to Youssef

directly, and there was no evidence that Maluto made any derogatory remarks about the claimant's disability.

Youssef identified two comments by Lara. First, when Youssef arrived at a meeting later than other employees, Lara said, "You made it." Objectively, the comment does not belittle Youssef on the ground of her disability. Even if the comment referred to the fact that Youssef was late to the meeting, the evidence did not show that Youssef was unable to allow time to arrive at the meeting on time. Second, in April 2016, the superintendent of Los Padrinos Juvenile Hall complained that employees with minor injuries did not want to work, and Lara responded, "Why are we talking about other employees, when we have one right here." Youssef believed that Lara's comment was about her because she was the only employee present who fit the description.

Virgil overheard a comment by Sims at an unknown point in time, which Youssef did not hear, in which Sims said that she could go home and back in the time that it took Youssef to walk to the office from the parking lot.

These limited incidents of insensitive comments, no more than one or two by each supervisor over a span of more than five years, and none made directly to Youssef specifically about her disability, did not amount to conduct that was sufficiently severe or pervasive to alter the conditions of Youssef's employment and create a hostile or abusive work environment based on her protected disability status. All of the other conduct that Youssef contends constituted harassment were commonly necessary personnel managements decisions, such as decisions about work assignments, performance evaluations, and which employees were to attend meetings. Under the totality of the circumstances,

40

none of the comments identified by Youssef, standing alone or taken collectively over a period of five years, were sufficient to create a triable issue of fact as to harassment.

## Discrimination

Youssef contends that she raised a triable issue of fact as to whether the County discriminated against her on the basis of her disability.  Specifically, she contends that she was given a higher caseload than her peers, received a negative employment evaluation that made her effectively unpromotable, and was subjected to severe harassment rising to the level of an adverse employment action.  We conclude that no triable issue of fact has been shown.

### A.  Burden-Shifting Analysis

"Generally, in cases alleging employment discrimination, California has adopted the three-stage burden-shifting test established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792.  [Citations.]  This test 'reflects the principle that *direct evidence* of intentional discrimination is rare, and that such claims must usually be proved circumstantially.  Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained.' " (*Zamora*, *supra*, 71 Cal.App.5th at p. 31.)

"Under the *McDonnell Douglas* test, the plaintiff has the initial burden of establishing a prima facie case of discrimination.

[Citation.] To meet this burden, the plaintiff must, at a minimum, show the employer took actions from which, if unexplained, it can be inferred that it is more likely than not that such actions were based on a prohibited discriminatory criterion. [Citation.] A prima facie case generally means the plaintiff must provide evidence that (1) the plaintiff was a member of a protected class, (2) the plaintiff was qualified for the position he or she sought or was performing competently in the position held, (3) the plaintiff suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests a discriminatory motive." (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1004 (*Scotch*).)

"If the plaintiff establishes a prima facie case, then a presumption of discrimination arises, and the burden shifts to the employer to rebut the presumption by producing admissible evidence sufficient to raise a genuine issue of material fact the employer took its actions for a legitimate, nondiscriminatory reason. [Citation.] If the employer meets that burden, the presumption of discrimination disappears, and the plaintiff must challenge the employer's proffered reasons as pretexts for discrimination or offer other evidence of a discriminatory motive." (*Scotch*, *supra*, 173 Cal.App.4th at p. 1004.)

"[T]o avoid summary judgment, an employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination. [¶] It is not enough for

42

the employee simply to raise triable issues of fact concerning whether the employer's reasons for taking the adverse action were sound." (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004–1005.)

"As several federal courts have stated: 'The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. [Citations.] Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for the [the asserted] non-discriminatory reasons." ' " (*Hersant v. Department of Social Services*, *supra*, 57 Cal.App.4th at p. 1005.)

"When seeking summary judgment or summary adjudication in an employment discrimination case, the burdens established by the *McDonnell Douglas* framework are altered. The 'employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors.' " (*Zamora*, *supra*, 71 Cal.App.5th at p. 32.) If the employer satisfies the initial burden on summary judgment, the burden shifts to the plaintiff to demonstrate a triable issue of fact. (*Ibid.*)

## B. Workload

There is no evidence from which to infer that Youssef was given a higher caseload or more burdensome work assignments as a result of her disability. Prior to the date of her disability, Youssef was responsible for cases at Central Juvenile Hall. In her own words, this assignment was the largest location with the most difficult cases. Her caseload was approximately 130 to 150 cases, which accounted for approximately one-fourth of the cases in the probation department. In addition to the Central Juvenile Hall caseload, she had taken on time-consuming additional responsibilities due to a shortage of staff members.

After the date of her disability in February 2013, the evidence showed that she received the same workload or less work. There is no evidence that she received a different caseload in August 2013, when she returned to work for three months. When she returned to work in May 2015 after her second medical leave, she received the caseload for Los Padrinos Juvenile Hall, which was only approximately 61 to 68 cases. She stated that in addition to these cases, she was responsible for the caseload of Barry J. Nidorf Juvenile Hall when the case manager for that hall was absent, but she did not state how often the case manager for that hall was absent or how many cases were involved. The caseload for Barry J. Nidorf Juvenile Hall was not mentioned in her June 2015 IPM, nor in her August 2016 performance evaluation addressing her work responsibilities from the prior year.

In approximately June 2017, the caseload for Central Juvenile Hall was assigned to Youssef after the case manager for that hall left the unit bringing Youssef's caseload to 140 cases,

44

which she declared was above the normal caseload for other case managers. The total number of cases, however, was not more than Youssef had prior to her disability in February 2013.

When she returned from medical leave again in December 2017, Youssef was assigned to area offices and had responsibility for a juvenile hall when the case manager was absent. For part of 2018 and 2019, Youssef was assigned the first 90 days of cases for area offices and the cases at the Barry J. Nidorf Juvenile Hall, as well as camps. The first 90 days required less active management of the cases by Youssef. A new case manager was hired for the camps, and although the cases for the camps were not transferred as quickly as Youssef would have liked, the cases were transferred to the new employee.

Youssef provided Pickett's deposition testimony stating that the highest caseload Pickett had during the time that she was a case manager was approximately 70 cases, but Pickett clarified that she managed field cases. Youssef's work restrictions were incompatible with a field assignment.

The evidence showed the employees in the return-to-work unit were, at all times, overworked. There was no evidence that Youssef suffered an adverse employment action in the form of a greater workload than she had before the date of her disability, and Youssef has not shown that the burden of completing work due to vacancies in the department was disproportionately assigned to her after the date of her disability. In fact, the evidence showed her supervisors gave her a juvenile hall with less difficult cases than Central Juvenile Hall upon her return to work from her second medical leave, did not assign her field cases, and eventually gave her a less active assignment limited to the first 90 days of cases.

We note that even were we to conclude that there was a triable issue of fact as to whether Youssef was subject to an adverse employment action, the County submitted evidence showing Youssef's work assignments resulted from legitimate business decisions. The County's method of assigning caseloads by location did not have to be wise, as long as the reasons were not based on a discriminatory motive. The County's evidence was sufficient to shift the burden to Youssef to show a triable issue of fact. Although Youssef would have preferred caseloads to be divided among the staff when a case manager was absent or a position was vacant, she has not raised a triable issue of fact that the supervisors' method was a pretext for discrimination.

## C. Performance Evaluation

Youssef did not show that the negative performance evaluations she received were an adverse employment action based on her disability. She received a negative counseling memorandum prior to the date of her disability that raised the same performance issues as the evaluations she received after her disability. There was evidence that several other employees had their performance subjected to heightened scrutiny, regardless of disability status, resulting in multiple employees leaving the unit. Youssef also did not show that negative performance evaluations had any bearing on promotion decisions. Even the performance improvement plan created to address issues raised in the evaluations was set aside and did not result in any adverse employment action being taken against her.

Even were we to assume, however, that the negative performance evaluations were an adverse employment action, the

46

County presented evidence of legitimate business reasons for the evaluations. The County's evidence was sufficient to shift the burden to Youssef to show a triable issue of fact existed. She did not present evidence from which a trier of fact could reasonably conclude the County's reasons for her negative performance evaluations were pretextual. She admitted grammar errors in letters that she drafted, although she blamed some of the errors on samples that she was given to follow. She admitted that Sims had taken over IPM's. No triable issue of fact was raised as to whether the reasons given for the negative performance evaluations were false and a pretext for discrimination.

### D. Promotion

There was no evidence from which a trier-of-fact could conclude that Youssef did not receive a promotion due to her disability. Sims received a promotion for which Youssef was eligible, but Maluto asked Sims to begin performing the work of a senior departmental personnel technician long before the date of Youssef's disability. The County presented legitimate business reasons for selecting Sims instead of Youssef for promotion to the available position in July 2014, because Sims had worked in the unit for one or two years longer than Youssef and was already performing the work in an acting capacity. Youssef did not present evidence that the County's reasons were pretextual, or that there were other promotion opportunities for which she was not considered. Youssef believed another employee transferred to the unit and received a promotion while Youssef was on medical leave, but she has not argued or presented evidence that she

should have received this promotion instead of the transferred employee.

## E.  Additional Actions Alleged

Youssef raised several additional actions during oral argument, but did not establish a triable issue of material fact that these incidents supported a discrimination claim.  For example, she was required to track work during overtime hours when her coworkers were not, and she was given an assignment on the day before her vacation, but the evidence showed that both of these actions took place before the date of her disability.  These were not adverse employment actions taken against her due to her disability.

As discussed above, the evidence does not support a claim for harassment, and therefore, it does not support Youssef's claim that she suffered severe harassment rising to the level of an adverse employment action.

She asserted that she was excluded from a meeting, but the County provided a legitimate business reason for limiting the meetings to employees with cases being reviewed and Youssef did not raise a triable issue of fact that the County's reason was pretextual.  In addition, her supervisor offered to provide the training that she missed, but Youssef chose to seek the training from a coworker.

Youssef also complained that she was not invited to a holiday party.  Even assuming the lack of a holiday party invitation constitutes an adverse employment action, the evidence in this case showed that she was invited to attend the event.  She declined to attend because it was not scheduled for a

day that she was in the office, and when she asked her supervisor about attendance, the supervisor said it was not mandatory. There was no triable issue of material fact as to an adverse employment action concerning a holiday party invitation.

### F.  No Direct Evidence of Discriminatory Animus

Youssef contends that the burden-shifting analysis does not apply in this case, because she presented direct evidence of discrimination by Maluto, Sims, and Lara.  This is incorrect.

"Courts have held that the three-stage *McDonnell Douglas* framework does not apply when the employee presents *direct evidence* of discrimination." (*Zamora*, *supra*, 71 Cal.App.5th at p. 34.)  "Direct evidence is evidence that proves a fact without inference or presumption.  [Citation.]  Direct evidence includes comments that demonstrate discriminatory animus and a causal relationship between those comments and the adverse employment action." (*Id.* at p. 35.)

There was no direct evidence of discrimination presented in connection with summary judgment in this case.

### Retaliation

Youssef contends that she raised a triable issue of fact that the County retaliated against her for disputing statements in her performance evaluations and reporting violations of overtime policies, because they continued to overload her with work.

The three-step *McDonnell Douglas* burden shifting framework applies to a retaliation claim under FEHA.  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)  To establish

49

a prima facie case of retaliation under FEHA, "a plaintiff must show '(1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.' " (*Scotch*, *supra*, 173 Cal.App.4th at p. 1020.) The employer meets its initial burden on a summary judgment motion by presenting evidence that one or more elements of a prima facie case is lacking, or the employer acted for a legitimate, nondiscriminatory reason. (*Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1158.)

There was no evidence of an adverse employment action taken against Youssef in this case, as discussed above, and even if Youssef's work assignments and performance evaluations were considered adverse employment actions, the County provided evidence that her supervisors had legitimate business reasons for the actions. Youssef did not provide evidence from which a trier of fact could reasonably infer these actions were taken in retaliation for disputing statements in her performance reviews, filing a complaint about overtime abuses, or filing a workers' compensation claim based on her disability.

## Failure to Accommodate

Youssef contends she raised a triable issue of fact as to whether the County failed to accommodate her disability. Specifically, she contends the County should have offered her modified work, initial accommodations were not implemented by the County, her supervisors continued to overload her with work, and the County did not show it would be an undue hardship to

provide a modified work schedule or transfer to another unit.  No triable issue of fact has been shown.

"A reasonable accommodation is a modification or adjustment to the work environment that enables the employee to perform the essential functions of the job he or she holds or desires.  (*Nadaf–Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 974.)  FEHA requires employers to make reasonable accommodation for the known disability of an employee unless doing so would produce undue hardship to the employer's operation.  (Gov. Code, § 12940, subd. (m).)  The elements of a reasonable accommodation cause of action are (1) the employee suffered a disability, (2) the employee could perform the essential functions of the job with reasonable accommodation, and (3) the employer failed to reasonably accommodate the employee's disability."  (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 373 (*Nealy*).)

" 'Essential functions' means the fundamental job duties of the employment position the individual with a disability holds or desires.  'Essential functions' does not include the marginal functions of the position."  (§ 12926, subd. (f).)  A job function may be considered essential for different reasons, including that the position exists to perform that function or there are a limited number of employees among whom performance of that job function can be assigned.  (§ 12926, subd. (f)(1); Cal. Code. Regs., tit. 2, § 11065, subd. (e)(1).)

" 'Reasonable accommodation' may include either of the following:  [¶]  (1) Making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities.  [¶]  (2) Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of

51

equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." (§ 12926, subd. (p).)

The reasonableness of an accommodation generally is a question of fact, but an employer is not required to eliminate essential functions of a job to accommodate a disabled employee. (*Nealy*, *supra*, 234 Cal.App.4th at pp. 374–375.) "Where a quality or quantity standard is an essential job function, an employer or other covered entity is not required to lower such a standard as an accommodation, but may need to accommodate an employee with a disability to enable him or her to meet its standards for quality and quantity." (Cal. Code Regs., tit. 2, § 11068, subd. (b).)

"A leave of absence also may be a reasonable accommodation if, after the leave, the employee can return to work, with or without further reasonable accommodation, and the leave does not create an undue hardship for the employer." (*Zamora*, *supra*, 71 Cal.App.5th at pp. 41–42.) " 'Holding a job open for a disabled employee who needs time to recuperate or heal is in itself a form of reasonable accommodation and may be all that is required where it appears likely that the employee will be able to return to an existing position at some time in the foreseeable future.' " (*Id.* at p. 42.)

If an employee cannot perform essential functions of the position, a reasonable accommodation may include reassignment to a vacant position. (*Nealy*, *supra*, 234 Cal.App.4th at p. 377.) "Offering a disabled employee who can no longer perform the essential functions of his or her job a vacant position may be a reasonable accommodation even if the new position pays less

52

than the original job." (*Zamora, supra*, 71 Cal.App.5th at p. 42.) "The employer is not required to create a new position or to promote to accommodate disabled employees unless it has a policy or practice of creating new positions for disabled workers." (*Id.* at pp. 42–43.)

In this case, Youssef repeatedly agreed in writing that her disability did not prevent her from performing the essential functions of her position and she did not need any additional accommodation. The nature of her work restrictions required her to self-monitor compliance by taking breaks from typing, walking, and requesting assistance lifting materials over a certain weight limitation. The County provided parking accessible to the building.

Youssef had a heavy workload before and after her disability. There is no evidence that the quantity of cases was not an essential function of her position. In fact, there was evidence that when a case manager was absent or a position was vacant, covering the additional caseload over-burdened the remaining employees in the unit and work was not completed. There was also no evidence Youssef told the County that she could not manage the quantity of work required by the position while following her work restrictions. Youssef cannot create a triable issue of fact through a self-serving statement in her declaration that she informed her supervisors the initial accommodations were inadequate in contradiction of multiple written statements that she could perform the essential functions of her position without accommodation.

There is no evidence that modified or light duty work assignments existed. The County was not required to create a permanent light duty position for Youssef, which would increase

53

the workload for the remaining case managers. Had Youssef told the County that she was unable to complete an essential function of the position, the County would have considered whether reassignment was an available accommodation under the circumstances.

On appeal, Youssef argues that the inability to work under a particular supervisor can constitute a disability for which an employer may need to provide reasonable accommodations. In Youssef's declaration, she states that she did not say she could not work with her supervisor. Maluto was the supervisor that Youssef identified when she requested a transfer. Lara offered that Youssef could report directly to her, but Youssef declined this accommodation and stated that she did not have a problem reporting to Sims. Within two months of requesting a transfer, Maluto was transferred and no longer served as Youssef's supervisor. We conclude that the trial court properly granted summary judgment as to the claim for failure to accommodate her disability.

## Failure to Engage in the Interactive Process

Youssef contends that the County failed to engage in a timely, good faith, interactive process to determine whether a reasonable accommodation would enable her to perform the essential functions of her job, because the County did not hold an IPM until two years after Youssef filed her workers' compensation claim and did not hold an IPM after Youssef provided a doctor's note in June 2017. We disagree with Youssef's analysis.

" 'Under FEHA, an employer must engage in a good faith interactive process with the disabled employee to explore the alternatives to accommodate the disability.' [Citations.] FEHA requires an informal process with the employee to attempt to identify reasonable accommodations, not necessarily ritualized discussions." (*Nealy, supra*, 234 Cal.App.4th at p. 379.)

"To prevail on a claim for failure to engage in the interactive process, the employee must identify a reasonable accommodation that would have been available at the time the interactive process occurred. [Citations.] 'An employee cannot necessarily be expected to identify and request all possible accommodations during the interactive process itself because " ' "[e]mployees do not have at their disposal the extensive information concerning possible alternative positions or possible accommodations which employers have. . . ." ' " ' [Citation.] But the employee should be able to identify specific, available reasonable accommodations through the litigation process, and particularly by the time the parties have conducted discovery and reached the summary judgment stage." (*Nealy, supra,* 234 Cal.App.4th at p. 379.)

"The duty to reasonably accommodate a disabled employee is a continuing one that is not exhausted by one effort. [Citation.] 'A single failure to reasonably accommodate an employee may give rise to liability, despite other efforts at accommodation.' " (*Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 722.)

In this case, there is no evidence that Youssef had any work restrictions when she returned to work in August 2013 or that an IPM was required. Within three months, Youssef took medical leave until May 2015. In June 2015, a few weeks after returning from her second leave, the County held an IPM to discuss

55

Youssef's work restrictions. The first IPM based on the work restrictions imposed after her second medical leave was timely. Youssef cannot maintain a claim for failure to engage in the interactive process based on the date of the first IPM.

Youssef contends that after holding multiple IPM's, Lara failed to schedule an IPM based on a doctor's note she received from Youssef on June 28, 2017. There was no evidence, however, that the doctor's note contained new or different restrictions than the ones that the County had already accommodated. And although there was no evidence that Lara or Youssef took any further action on the note, the County accommodated Youssef approximately five weeks later through additional medical leave. Within one week of Youssef's return from this medical leave in December 2017, the County held an IPM for Youssef to discuss her work restrictions. In context, based on the evidence presented, Youssef cannot maintain a claim for failure to engage in the interactive process based on the delay between June and August 2017. Summary judgment was properly granted as to the claim for failure to engage in the interactive process.

## DISPOSITION

The judgment is affirmed.  Respondent County of Los Angeles is awarded its costs on appeal.
NOT TO BE PUBLISHED.


MOOR, J.


We concur:



RUBIN, P. J.



BAKER, J.